# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Ana Molina & Associates, a/k/a Molina Multilegal Services,<br>6056 Castor Avenue, Philadelphia, PA 19149 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   19-402-M |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

Ana Molina & Associates, a/k/a Molina Multilegal Services, 6056 Castor Avenue, Philadelphia, PA 19149

located in the     __Eastern__    District of    __Pennsylvania__   , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1341 and<br>1028A(a)(1) | Mail fraud and aggravated identity theft |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __ . ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*L. Reinhold*
*Applicant's signature*

Lisa Reinhold, Special Agent, US Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    March 12, 2019

*Thomas J. Rueter*
*Judge's signature*

City and state:   Philadelphia, PA

Thomas J. Rueter, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, Lisa Reinhold, being duly sworn, depose and say:

### AGENT INTRODUCTION

1.        I am a Special Agent employed by Homeland Security Investigations (HSI). HSI is an agency within the U.S. Department of Homeland Security (DHS) – Immigration and Customs Enforcement (ICE). I am currently assigned to the HSI office in Philadelphia, Pennsylvania. I have been employed by HSI as a Special Agent since November 2001.

2.        During the past seventeen years of employment, I have conducted numerous investigations involving immigration benefit fraud. These types of investigations have included individuals possessing fraudulent documents, individuals who make false statements on immigration forms, and individuals who commit visa fraud and naturalization fraud. My duties as a Special Agent for HSI include but are not limited to investigating violations of the Immigration and Nationality Act (Title 8 of the United States Code) and Title 18 of the United States Code. I am also familiar with and have dealt with the rules and regulations codified in Title 8 of the Code of Federal Regulations (CFR). I have received extensive training and have experience in the investigation and enforcement of the immigration laws of the United States.

### REQUEST FOR SEARCH WARRANT

3.        I am currently assigned the investigation of an individual named Ana Molina for violations of Title 18, United States Code, Section 1341 (Mail Fraud), and Title 18, United States Code, Section 1028A (Aggravated Identity Theft).

4.        This affidavit is being submitted in support of an application for one (1) warrant to search the following location: Ana Molina & Associates, a/k/a Molina Multilegal Services, 6056 Castor Avenue, Philadelphia, PA 19149, which is Molina's listed office, the SUBJECT PREMISES. This location is more fully described in Attachment A.

5.        The facts and information contained in this affidavit are based upon your affiant's personal knowledge as well as the observations of other law enforcement officers and U.S. government personnel involved in this investigation. All observations not personally made by your affiant were related to your affiant by the individuals who made them or were conveyed to

1

your affiant via review of records, documents, and other physical evidence obtained during the course of this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause to apply for a search warrant, it does not set forth each and every fact and matter learned by me or other investigators during the course of this investigation.

## THE INVESTIGATION INTO MOLINA

6.      The investigation in this matter has revealed that Molina is an attorney-imposter primarily operating in the Philadelphia, Pennsylvania metropolitan area, who falsely claims to some clients to be an attorney authorized to practice law. In that capacity, Molina has been hired by clients who pay Molina monetary fees in return for Molina's fraudulent legal representation and filing of immigration applications. Molina accepts money for filing applications for legal status adjustments the client may not even qualify for. There have been several immigration filings identified where Molina has stolen identity documents from unwitting individuals and used their information, to include tax returns, on immigration Form I-864, Affiant of Support. She does this to defraud Citizenship and Immigration Services (CIS) into believing the alien filing the application has the adequate means of financial support through the affiant and are not likely to rely on the U.S. government for financial support.

7.      For privacy purposes, alien registration file numbers of the victims will not be listed herein to protect their identity.

8.      Based on a review of identification records and other evidence, your affiant has learned that Molina is a female born in Peru on October 14, 1963. Molina became a naturalized US citizen on August 12, 1987. The name on Molina's naturalization certificate is "Ana Milagros Maylath." The name on Molina's U.S. passport is Ana Milagros Molina.

## OVERVIEW OF THE PROCESS OF ALIENS SEEKING IMMIGRATION BENEFITS AND ALIENS IN REMOVAL PROCEEDINGS

9.      The U.S. Department of Homeland Security (DHS) was created in 2003. Special Agents from the former U.S. Customs Service (Customs) (under the U.S. Department of the Treasury) and the Immigration and Naturalization Service (INS) (under the U.S. Justice Department) were merged to create Immigration and Customs Enforcement (ICE). The uniformed inspectors from Customs and INS became Customs and Border Protection (CBP) and

2

the alien benefit functions of INS were transferred to the newly formed Citizenship and Immigration Services (CIS). Pursuant to 8 CFR 1.2, *service* refers to ICE, CIS, and CBP. ICE, CIS, and CBP are all components of the Department of Homeland Security (DHS) and each agency has the authority to issue a Notice to Appear to an alien, which places the alien in removal proceedings.

10.     CIS handles forms submitted by aliens seeking immigration benefits to remain, enter, and work in the United States. The forms can be submitted to CIS by the alien or by an alien with the assistance of an immigration attorney or accredited representative.

11.     Based on your affiant's training and experience, when various immigration forms are mailed to CIS, it is common for CIS to maintain the envelope that the correspondence was mailed in inside the alien file. The envelope is also usually stored in close proximity to the contents of the letter.

12.     CIS has offices throughout the United States. CIS District Offices are located in major U.S. cities, and serve as the location where aliens go for interviews when they are seeking immigration benefits. CIS also operates service centers and processing facilities throughout the U.S. These service centers are usually geographically and regionally based, and serve as the central processing area where paperwork from aliens is first received. In turn, CIS confirms that the paperwork submitted by aliens and their attorneys (if applicable) is sufficient to move forward for adjudication, and ensures that forms are signed, dated and complete. These service centers also deposit filing fees required for immigration forms. Various forms for different immigration benefits go to different service centers, and it is common for an application to be mailed to a CIS office or regional processing/service center that is in a different state than where the alien resides before the alien is scheduled for an interview.

13.     Attorneys who represent DHS in removal proceedings are attorneys employed by ICE's Office of the Principal Legal Adviser (OPLA). These attorneys are referred to as government counsel or Service counsel, and are described in 8 CFR 1001.1(s) as any officer assigned to represent DHS in any proceeding before an immigration judge or the Board of Immigration Appeals (BIA). They are also referred to as Assistant Chief Counsels and Trial Attorneys, as detailed in the glossary of the Immigration Court Practice Manual.

3

14.     The Executive Office for Immigration Review (EOIR) is a component of the U.S. Department of Justice which is an administrative court in which removal proceedings of aliens are conducted before an Immigration Judge (IJ).  EOIR has courts nationwide in major cities, including Philadelphia and New York City.  EOIR Court in Philadelphia is located in the Nix Federal Building at 701 Market Street.

15.     EOIR courts contain recording equipment, as detailed in 8 CFR 1003.28, to create an official Record of the Proceeding (ROP), and the immigration court (EOIR) creates and controls the ROP, as detailed in 8 CFR 1003.36.  Pursuant to the glossary of the Immigration Court Practice Manual, EOIR is also referred to as "immigration court."

16.     The Board of Immigration Appeals (BIA) is a component of EOIR and is also under the U.S. Justice Department.  It is the highest administrative body for interpreting and applying immigration laws.  The BIA is located at EOIR Headquarters in Falls Church, Virginia. The BIA has been given nationwide jurisdiction to hear appeals from certain decisions rendered by immigration judges and district directors of DHS in which the U.S. government is one party and the other party is an alien, a citizen, or a business firm.  In addition, the BIA is responsible for the recognition of organizations and accreditation of representatives requesting permission to practice before DHS, the immigration courts (EOIR), and the BIA.

17.     Pursuant to 8 CFR 1.2, the *Board* means the Board of Immigration Appeals within the Executive Office for Immigration Review, Department of Justice as defined in 8 CFR 1001.1(e).  Pursuant to 8 CFR 1003.38, decisions of Immigration Judges may be appealed to the BIA as authorized by 8 CFR 3.1(b).

18.     Chapter 2 of the Immigration Court Practice Manual states that there are four categories of people who can present cases in immigration court: unrepresented aliens, attorneys, accredited representatives, and certain categories of other people who are expressly recognized by the immigration court.  The last category includes law students or unpaid individuals of good repute who assist aliens (such as clergy or family members).

19.     DHS Form G-28 is a Form used by three agencies of the U.S. Department of Homeland Security: Citizenship and Immigration Services (CIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).  The G-28 is designed to

4

determine whether an individual is an attorney eligible to act on behalf of an applicant, petitioner, or respondent pursuant to 8 CFR 1.2. The G-28 collects a variety of information from the attorney or accredited representative including name, law firm name, address, contact information (phone and e-mail address), and the attorney's state bar number. The G-28 does not ask for the attorney's date of birth, driver's license information, Social Security number, or where he or she went to law school; the G-28 also does not direct the attorney to submit a photo of themself. The G-28 is sworn to under penalty of perjury and requires the attorney's signature. The G-28 is filed with the U.S. government at no cost to the attorney. The contact information provided by the filing attorney is routinely used by the U.S. government to: contact the attorney regarding the alien's case; mail correspondence to the attorney including notices/decisions pertaining to the alien's case; and, schedule hearings and appointments. Molina does not have a G-28 on file accrediting her as an attorney. Molina lists herself as the "preparer" on forms filed with CIS.

## BACKGROUOND DETAILS OF INVESTIGTION

20.     In 2015, HSI was contacted by an attorney, V.S., who was acting as counsel for O.C.F. O.C.F. is a Mexican national who entered the United States without inspection in 2011. His wife and their US citizen child reside with him. V.S. stated her client, who previously believed he was legally represented by Ana Molina, was defrauded. O.C.F. went to Molina's office located at 6056 Castor Ave, Philadelphia, PA, and stated he needed legal representation regarding his immigration status. Molina stated to O.C.F. she was an attorney and would take his case. Molina collected money for legal services on two occasions from O.C.F., a total of approximately $900. O.C.F. was scheduled for a hearing in front of the Immigration Judge (IJ) in June 2015 and, before the hearing, Molina called him and stated she was tied up with another court hearing and O.C.F. would be represented by an "older lady." O.C.F. approached a woman who met that description just outside the court and she introduced herself, speaking limited Spanish, as Janet Hinshaw-Thomas. After O.C.F. was in the courtroom, he observed Molina enter but sit down in the back. Afterwards, Molina explained that Hinshaw-Thomas had already entered her appearance to represent him in court that day and that by the time Molina got to court, it was too late to change it. O.C.F. stated that Molina repeatedly called him after this initial

hearing requesting additional money for her continued representation as his lawyer. Molina scheduled a meeting with O.C.F. at Hinshaw-Thomas's office, but O.C.F. did not attend the meeting. O.C.F. told Hinshaw-Thomas he did not want to be represented by her and contacted V.S. to ensure legitimate representation.

21.     On November 20, 2018, your affiant conducted an interview of S.E. S.E. you're your affiant that she filed a police report against Ana Molina on October 3, 2014, for defrauding her. S.E. is the godmother to a girl who was fathered by M.A.F. S.E. met M.A.F. through church and became friends. M.A.F. was encountered and administratively arrested by deportation officers for being present illegally in the United States. S.E. went online to find an immigration attorney who would be able to assist with preventing his deportation. While conducting the search she found Ana Molina operating from the SUBJECT PREMISES.

22.     On or about September 2, 2014, S.E. called Molina who stated she was an immigration attorney and would be able to assist. S.E. went to the SUBJECT PREMISES, where Molina has an office in the back of the premises. Again, Molina stated she was a licensed attorney. This meeting was witnessed by M.R.V., S.E.'s sister. Molina requested $1,300 to accept the case on behalf of M.A.F. S.E. gave Molina the money in cash the next day at the business location. She does not recall if she was given a receipt following the transaction.

23.     Molina told S.E. she would be able to stop M.A.F.'s deportation. She asked questions about M.A.F.'s family. S.E. told Molina M.A.F.'s daughter had a kidney issue when she was a baby but she was five now and it was no longer affecting her health. Molina advised S.E. she needed to try and get documentation misrepresenting the seriousness of that kidney issue and claim it was ongoing. S.E. stated she would try and departed the business.

24.     Later that day, M.A.F. called S.E. and advised S.E. not to hire an attorney because he had already been deported. S.E. immediately called Molina and stated she would not need her services and requested her money to be refunded; Molina refused to refund any of the money. S.E. told Molina this was fraud and she would pursue the issue legally. S.E. explained she was not an illegal alien and wasn't afraid to report Molina to the police. S.E. stated Molina appeared not to believe her and was extremely rude and combative over the phone.

25.     S.E. took the case to Philadelphia Municipal Court and on November 17, 2014,

6

was awarded a judgment of $645.00 from Molina (SC-14-10-02-3328). S.E. stated MOLINA lied to the judge saying she never claimed to be an attorney. S.E. went to the SUBJECT PREMISES to pick up a check for the amount of the judgment. Molina's secretary handled this encounter.

26.     On November 7, 2019, your affiant interviewed E.P., who stated he met Ana Molina during the time that she was representing his sister, M.P. E.P. said Molina told them she was an attorney. M.P. subsequently hired Molina with the assumption that was true. Molina claimed she would be able to assist with keeping M.P. in the United States, but M.P. was eventually deported.

27.     Molina also informed E.P.'s other sister, C.P., that she was an attorney and accepted money for "legal services" from C.P.

28.     Molina told E.P. she could help him get his green card by filing a Form I-360 since his US citizen wife had recently passed away due to an overdose. E.P. met with Molina at the SUBJECT PREMISES and brought all of his previous immigration records/paperwork with him to the meeting. Molina told E.P. his previous deportation would not be a problem.

29.     Molina instructed E.P. that it would cost $1,500 to complete and file the Form I-360. E.P. initially paid $1,000.00 to Molina; Molina requested $500.00 in cash and $500.00 in a money order. Molina said she was out of receipts and could not provide him with one for the $500.00 cash payment. E.P. paid another $500.00 two or three days later. Afterward, E.P. received a telephone call from Molina's office informing him there was another application he had to file with the Form I-360 that would cost more money.

30.     Molina also requested another $2,000 from E.P.'s sister, C.P., to file an address change with CIS and avoid her deportation.

31.     Due to both of his sisters' dealings with Molina, and the request of additional money for his filings, E.P. refused to pay Molina any more money, informed Molina he did not have the money, and would not be paying her to file any more forms. E.P. requested a refund of his money and Molina refused to give E.P. any more than $20.00, which was provided in the form of a money order.

32.     Your Affiant and the Office of Fraud Detection and National Security (FDNS) began to analyze petitions and applications associated with Molina.

7

## **Fraudulent Use of T.C.'s Identity**

33.     On October 31, 2017, FDNS Officer William Buonocore contacted T.C., after it was determined that Molina filed separate I-864s (Affidavit of Support) for J.P. and C.E.B. using T.C.'s identification information. Officer Buonocore verbally identified himself as an Immigration Officer with the Department of Homeland Security and asked if T.C. had completed any paperwork on behalf of J.P. or C.E.B. T.C. stated he has never filed any paperwork on behalf of or agreed to financially support either subject at any time. T.C. knows of J.P. from his neighborhood, but does not know C.E.B.

34.     Officer Buonocore ensured that T.C. obtained a photocopy of the Form I-864 signature page for his review. Later, T.C. indicated that he definitely did not sign the form, and had never seen it.

35.     T.C. also stated that he was previously contacted by the IRS in December 2014 and informed that he had requested copies of his IRS transcripts, but he never did. The IRS advised that the "requested" transcripts for tax years 2011-2013 were faxed to 215-289-5347 on November 25, 2014.

36.     On December 8, 2014, T.C. and his bank representative, J.I., learned that fax number 215-289-5347 belonged to Ana Molina and Associates at the SUBJECT PREMISES. On that same date, J.I. faxed a memo to the Molina fax number and requested they call him back at the bank. Ana Molina called J.I. back and left him a voice mail. J.I. never called Molina back, but documented that the fax number belonged to Molina.

37.     On December 8, 2014, T.C. filed a police report with Philadelphia Police Department stating his taxes were requested and sent to fax number 215-289-5347 without his permission.

38.     During a review of the adjustment of status paperwork for both J.P. and C.E.B., including the I-485s (Application to Adjust Status), I-130s (Petition for Alien Relative) and I-864s (Affidavit of Support), your affiant observed copies of T.C.'s taxes with a fax cover sheet dated November 25, 2014, from the IRS. The message states 'We've enclosed the transcript or transcripts that you requested on November 25, 2014."

8

## Fraudulent Use of X.T.'s Identity

39.     Your affiant reviewed Alien File A20794XXXX, assigned to E.B., a Lawful Permanent Resident (LPR) from Jamaica. Molina submitted a Form I-485 and other documents to CIS on E.B.'s behalf. While reviewing E.B.'s file, it was noted that the I-864 co-sponsor is X.T., a Dominican born, US citizen. The I-864 was purportedly signed by X.T. on September 10, 2015. The application included X.T.'s pay stubs from Marriot Intl Admin Services and her 2012, 2013 and 2014 tax returns.

40.     X.T. had used Molina's business for services prior to September 10, 2015, for her husband, J.C. Ana Espinosa (Molina) signed the I-485 as the preparer. X.T. signed the form and provided Molina with her stubs from Marriot Intl Admin Services and her 2012, 2013 and 2014 tax returns, the same as those used for E.B.'s application. The signature which purports to be that of X.T. on E.B.'s application is different from that appearing on the form that X.T. signed on behalf of her husband, J.C.

41.     On December 13, 2018, your affiant interviewed X.T. and J.C. and inquired about the process they used to file J.C.'s immigration documents. They explained they initially went to a woman on Castor Ave. (the SUBJECT PREMISES) named Ana, who said she worked with an immigration attorney. They gave Ana $1,800 for her initial representation and filing of their applications. They gave Molina their tax returns and pay stubs.

42.     When X.T. and J.C. became dissatisfied with Ana's representation, they asked for their money back. Ana refused and became verbally abusive with J.C., telling him "he wasn't anything and he was illegal and couldn't do anything to her." Molina also told J.C. and X.T. that if they wanted her to help with anything else, J.C. would have to write her an apology letter for getting upset with her.

43.     X.T. and J.C. stated that Ana Molina did not return any of their identification-bearing documents to them.

44.     X.T. confirmed that immigration forms filed on J.C.'s behalf shown to her by your affiant appear to be the forms she filed through Molina and that the tax returns and pay stubs were among the documents she provided to Molina at the SUBJECT PREMISES.

45.     X.T. also confirmed that she never sponsored anyone else on an Affidavit of

9

Support (I-864), other than her husband, J.C.

46.     X.T. reviewed the application filed by Molina for E.B. that included X.T.'s purported signature, pay stubs, and tax returns. X.T. confirmed that the pay stubs and tax returns belonged to her, but she did not know E.B. and the signature on the application was not hers.

## Fraudulent Use of M.C.'s Identity

47.     CIS identified three separate Form I-130 filings done by E.R. on behalf of his mother M.R.S. Ana Molina prepared all three Form I-130's. All petitions were ultimately rejected for being incorrectly filed. M.R.S. is married to M.C.

48.     On September 11, 2018, A.R.S. filed Form I-485 for herself that was prepared by Ana Molina. In addition, A.R.S. filed Form I-485s for her two daughters that were also prepared by Ana Molina. The Form I-864 co-sponsor for all three Form I-485s was M.C. and M.C.'s pay statements, W-2, 2015-2017 tax returns, and a photograph of his green card were attached.

49.     On January 29, 2019, your affiant interviewed E.S. and A.R.S. E.S. wanted to sponsor A.R.S. for a K1 visa. E.S. hired Molina for immigration services and paid her approximately $9,000 in cash. Of this money, Molina told E.S. and A.R.S. that A.R.S. would need an additional sponsor and would be able to provide one for $500.

50.     Your affiant showed A.R.S. her immigration application and she and E.S. confirmed their identification information on the application. They both denied knowing M.C., who was identified as A.R.S.'s co-sponsor.

51.     Prior to meeting with E.S. and A.R.S., you affiant had conducted an interview of M.C. and M.R.S. on January 23, 2019. M.C. and M.R.S. indicated that they met Ana Molina approximately seven years ago. Molina assisted M.R.S.'s family, specifically her father, with filing immigration forms and M.R.S. believed Molina was an attorney. Afterward, Molina assisted M.R.S. with other matters. When dealing with Molina, M.C. and M.R.S. brought their tax returns and pay stubs to Molina at the SUBJECT PREMISES. As recently as a week before this interview, Molina asked M.R.S. and M.C. for copies of additional tax returns and pay stubs, but they have not provided the requested documents.

52.     M.C. stated that he did not authorize Molina or anyone else to share or use his identification information. He confirmed that he did not authorize the use of his employment

information and tax returns, which were attached to the immigration application of A.R.S.

53.     M.C. was shown a photograph of A.R.S. and a signature appearing on A.R.S.'s immigration application. M.C. stated that he did not recognize A.R.S.'s name or her image. He also stated that the signature was not his. Under M.C.'s forged signature on the application is a date, "8/1/2018." The application indicates that it was prepared by Molina and under her signature the 8/1/2018 date is written in the same fashion/format, indicating it was the same person's handwriting.

## Fraudulent Use of M.U.L.'s

54.     On September 5, 2017, E.T. filed Form I-485. According to the I-485, E.T.'s spouse, A.T.U., a US citizen, claimed that she had $0 income for 2014-2016 and did not financially support E.T. on her Form I-864 (Affidavit of Support). A.T.U.'s sister, M.U.L., was the co-sponsor, completed a Form I-864, and provided her 2014-2016 tax returns, W-2s, and Earnings Summaries. E.T.'s Form I-485 indicates it was prepared by "Jeannie" Molina of Molina Multilegal Services and the Form I-864 indicates it was prepared by Ana Molina of Molina Multilegal Services, located at the SUBJECT PREMISES.

55.     On March 4, 2019, your affiant interviewed A.T.U. A.T.U. stated that she received a referral to Ana Molina from Ana Molina's husband, Carlo Molina, who said Ana was an attorney and could help A.T.U.'s husband get his green card.

56.     A.T.U. and her husband went to Ana Molina's office at the SUBJECT PREMISES in 2017. Molina advised she was an attorney and could assist A.T.U. and her husband. Molina also advised that payments would have to be cash only; she requested $300 at the first meeting and stated the total process would cost approximately $1,000.

57.     Ana Molina asked A.T.U. to obtain numerous documents from her sister, M.U.L., because she had long-term employment history. A.T.U. gathered M.U.L.'s W-2s and pay stubs and brought them back to Molina at the SUBJECT PREMISES. A.T.U. stated she signed some forms with Molina, but never signed her sister M.U.L.'s name on anything. A.T.U. said she never gave Molina permission to use her sister's information to assist anyone except her husband.

58.     Molina advised E.T. to obtain a Pennsylvania driver's license to take with him for their meeting with CIS and because he didn't do it immediately, Molina became irate and

abrasive. Later, when it came time to appear at CIS, Molina told E.T. and A.T.U. that she did not need to represent them at CIS because she had "everything set up" for them there.

59.     A.T.U. described Molina's office at the SUBJECT PREMISES and said Molina had drawers along the wall and under her computer where she saw Molina store copies of immigration documents.

60.     On October 25, 2017, a Form I-485 was filed for S.A.R.V. S.A.R.V.'s Form I-485 indicates it was prepared by Ana Molina of Molina Multilegal Services. His spouse, D.C., a US citizen also claimed that she did not earn enough to financially support S.A.R.V. on her Form I-864. S.A.R.V.'s filing also included a Form I-864 purportedly co-sponsored by M.U.L. The filing included all of M.U.L.'s previously submitted materials. M.U.L.'s signature is substantially different on the two Form I-864s.

61.     On February 11, 2019, your affiant interviewed M.U.L. She confirmed that she agreed to co-sponsor E.T. and provided her sister, A.T.U., with documents that included M.U.L.'s W-2s, pay stubs, and a tax return. M.U.L. did not go to Molina Multilegal Services, but did authorize A.T.U. to sign her name on immigration documents provided to Ana Molina.

62.     M.U.L. stated that she did not agree to co-sponsor any immigration applicants other than E.T. M.U.L. also did not authorize her sister, A.T.U., to share M.U.L.'s identity documents with anyone for any other purpose.

63.     M.U.L. stated that she did not know S.A.R.V. or any person mentioned in S.A.R.V.'s application. M.U.L. stated the signature on the forms was not hers and someone else must have signed them. She stated she never would have allowed Molina to use her information.

### Confirmation of Molina's Ties to the SUBJECT PREMISES

64.     On March 1, 2019, E.P., referenced previously in paragraphs 26-31, placed a consensually recorded telephone call to Molina and asked her if she was still a lawyer. She replied yes. E.P. stated he had been arrested by immigration and may need her assistance. Molina told E.P. to come to the SUBJECT PREMISES that day, indicating she was still operating from that address.

65.     All of the applications filed by Ana Molina for the above mentioned subjects were mailed to CIS's Service Center at P.O. Box 805887, Chicago, Illinois 60680 in envelopes with a

return address of the SUBJECT PREMISES.

## CONCLUSION AND ITEMS TO BE SEIZED

66.     Based on your affiant's training and experience, as more fully described above, and as supplemented by my conversations with other federal agents who are experienced investigators of mail and wire fraud, and identity theft, I know:

a.      that individuals involved in crimes involving identity theft, false statements, and fraudulently purporting to act as a barred attorney, particularly on the scale on which the defendant engaged in those crimes, frequently maintain, among other documents and materials: financial statements and bank records in the name of other persons; correspondence, notes, diaries and calendars reflecting personal identification information about other persons; identification documents, including picture IDs, counterfeit or stolen checks, and Social Security numbers in others' names; telephone and other utility bills and records in other persons' names; mail, FedEx air bills, and other courier packages addressed to other persons; fax machines used to send and receive documents used in furtherance of such schemes and verification printouts resulting from the successful transmission of faxes; and, computers and computer equipment;

b.      that individuals involved in false statements and identity theft frequently maintain custody of documents and records of the sort described above for long periods of time in order to potentially reuse the stolen identity information to commit further fraud with those identities and that this stolen identity information is often hidden within closed and/or locked drawers, cabinets, briefcases, and other containers; and,

c.      that individuals involved in mail fraud, particularly the type which involves the preparation and filing of documents, including court documents, typically keep books and records of these activities, including electronic versions of these items.  These books and records include but are not limited to: copies of court documents and filings (and notes made in preparation of such documents

13

and filings), "attorney" files and note, identification documents, electronic filing records, address lists, Rolodex or other similar contact information, bank account records and cancelled checks, and accounting records, banking records, communication records, customer records, journals, ledgers, invoices, receipts, purchase orders, checking account records, federal, state and local tax records, personnel records, customer lists, business contacts, and administrative records.

67.     As described above and in Attachment B, this application seeks permission to search for records constituting evidence, fruits or instrumentalities of violations of Mail Fraud (18 U.S.C. § 1341) and aggravated identity theft (18 U.S.C. § 1028A) that might be found within the SUBJECT PREMISES, in whatever form they are found. Another form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for seeks authorization to seize computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

68.     I submit that if a computer[1] or storage medium[2] is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be

---

[1] For purposes of the requested warrant, a "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[2] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs and DVDs, and flash drives.

recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

69.   As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

15

processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions. Therefore, contextual information necessary to

16

understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

70.    In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to "image" the date stored on such devices. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable. Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of

computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   The variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

71.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying all electronic devices, computers, hard drives, and storage media consistent with the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

72.   Based on the above facts, I submit there is probable cause to believe that evidence of violations of Title 18, United States Code, Sections 1341 (mail fraud), and Title 18, United States Code, Section 1028A (aggravated identity theft), are located at the SUBJECT PREMISES, that is, Molina's business address, 6056 Castor Ave, Philadelphia, PA 19149.

Special Agent Lisa Reinhold
Homeland Security Investigations

Sworn to and subscribed before me
this __15__ day of March, 2019.

Honorable Thomas J. Rueter
United States Magistrate Judge

18

## Attachment A
## Description of Location to be Searched

The SUBJECT PREMISES is a storefront location with a sign advertising "Molina Multilegal Services." The address of 6056 Castor Avenue, Philadelphia, Pennsylvania 19149, is marked on the sign as well as over a white door. The location has a big glass window to the right of the door, which, when opened, allows you to view who is situated in the front of the location. Below is a recent photograph of the SUBJECT PREMISES:



## Attachment B
## Items to be Seized

Evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1341 and 1028A, including the following:

1. Any document or item with the name Ana Molina, Ana Molina and Associates, Molina Multilegal Services, or any variant thereof;

2. Calendars, address books, Rolodex, appointment books, records, ledgers, papers, correspondence and other documents reflecting information such as names, telephone numbers and personal identification information;

3. Any form of identification to include photo ID, business cards, social security cards, and credit cards, bank cards, passport, or business or court registration cards;

5. All federal, state and/or local individual and/or business tax returns, filed and unfiled, including any and all schedules, all Forms W-2, W-3, W-4, W-9, SS-4, 940, 941, 990, 1040, 1098, 1099, 1120, 1120-S, and 5498, filed and unfiled; written correspondence to and from the IRS; electronic filing records; and all books, work papers and records used to prepare tax returns, including back-up documentation, identification documents, electronic filing records, address lists, Rolodex or other similar contact information, bank account records and cancelled or uncashed checks;

6. Financial documents, in electronic or paper form, including: bank records, bank statements, deposit slips, withdrawal slips, checks deposited, cancelled checks, check stubs, all debit and credit memos, and financial statements;

7. Computers[3] or storage media[4] that contain records or information (hereinafter "COMPUTER") used as a means to commit violations of Title 18, United States Code, Sections 1341 and 1028A. All information obtained from such computers or storage media will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 1341 and 1028A, involving Molina since 2014, including:

---

3    A computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers, and network hardware, such as wireless routers.

4    A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs, DVDs and flash drives.

20

a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, and correspondence;

b.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the lack of such malicious software;

d.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.     evidence of the times the COMPUTER was used;

g.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.     contextual information necessary to understand the evidence described in this attachment;

j.     routers, modems, and network equipment used to connect the Computers to the Internet;

k.     Internet Protocol addresses used by the COMPUTER; and

l.     records or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

8.     All closed and/or locked containers, including but not limited to briefcases, file folders, file cabinets and safes, lockboxes, security containers, and other receptacles for storing cash and financial instruments, and any keys to these sorts of containers, file cabinets, or safes.

9.     Bank safety deposit box records and keys;

10.    Correspondence, account records, invoices, memoranda, contracts, payment records, work product, and other documents concerning or relating to Molina's fraudulent legal representation;

11.    Invoices, correspondence, billing records, checks and money orders, credit card receipts, statements from financial institutions and all other records evidencing remuneration or compensation received from or due from customers and clients;

12.    Indicia of ownership, including, but not limited to, title, registration, and loan records, of all vehicles, including automobiles, boats, and/or airplanes;

13.    Documents concerning or related to assets, including, but not limited to, real estate, cash, and other valuables;

14.    Records relating to the existence, ownership, and control of any storage facility, post office box, or mail drop box, and keys;

15.    Any and all electronic devices which are capable of analyzing, creating, displaying, converting transmitting, or storing electronic or magnetic computer impulses or data and which contain the records identified above.  These devices include but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drivers, hard drives, hard disks, floppy disks, laser disks, cell phones, and other computer related electronic devices;

      a.   This includes any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer, or related components.

      b.   The items to be seized could include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission;

      c.   Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device;

      d.   Passwords, including but not limited to PGP pass-phrases and keys or other de-encryption codes necessary to access the electronic data-files stored on any of the devices described above; and,

22

e. Evidence of user attribution showing who used or owned the electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, browsing history, photographs, and electronic messages.